IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| THERESA B. CLARK ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL NO. 3:10cv111-REP |
| ) | |
| PAUL NAPPER, PSY.D., ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the Defendant's motion for summary judgment (Docket No. 18) and the Defendant's motion to strike Plaintiff's memorandum in opposition thereto (Docket No. 24).[1] For the reasons set forth herein, it is the Court's recommendation that the Defendant's motion to strike be DENIED and that the Defendant's motion for summary judgment be GRANTED.

## I. FACTS

The Court has reviewed each party's statement of undisputed facts, including the extensive supporting documentation filed by each party. Resolving all genuine disputes of material fact in favor of the Plaintiff, as required, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and eliminating those factual assertions that are immaterial, the Court has concluded that the following narrative represents the undisputed material facts for purposes of

---

[1] At oral argument, the Defendant withdrew the motion to strike. The Court therefore recommends that it be denied as moot.

resolving the motion seeking summary judgment.

Beginning in 1997, MeadWestvaco Corporation ("MWV") hired Paul Napper, Psy.D. ("Napper" or "Defendant") as a third-party consultant to assist with the professional development of its high level employees. (Compl. ¶¶ 3-4; Napper Decl. ¶¶ 2-3.) In this capacity, Napper would visit the Richmond offices of MWV monthly to provide his services. (Compl. ¶ 7; Clark Dep. at 36:13-16; Napper Decl. ¶¶ 2-3.) As part of his services, Napper assisted MWV's human resources department with 360 performance evaluations ("360 Evaluations") -- detailed and highly confidential performance evaluations setting forth the views of superiors, subordinates, and peers of the subject employee. (Napper Decl. ¶ 2.)

On March 31, 2008, MWV hired Teresa Clark ("Clark" or "Plaintiff") to work as an executive assistant at the Richmond, Virginia office. (Clark Dep. at 27:12-16.) In that capacity, she provided administrative support to Paula Rieck ("Rieck") and Stephanie White ("White"), both vice presidents in MWV's human resources department. (Clark Dep. ¶ 27:17-25.) On a limited basis, she also provided administrative support to Napper. (Napper Decl. ¶ 3.) Clark's direct supervisor was Valerie Hewlett ("Hewlett"). (Clark Dep. at 32:17-23.)

On August 6, 2009, Napper was at the Richmond offices for a meeting about a 360 Evaluation of a senior MWV vice president. (Napper Decl. ¶ 4.) He needed an additional copy of a confidential 360 Evaluation for an afternoon meeting, and he was behind in his planned schedule. (Napper Decl. ¶ 4; Napper Dep. at 9:10-16; Clark Dep. at 39:11-40:13.)[2] Shortly after

---

[2]Clark challenges Napper's credibility because he changed his story from having one copy of the document and needing a second, to having two copies and needing a third. (Pl.'s Br. at 13-14.) This fact is not material, and, accordingly, the Court places no significance on such a mundane detail. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

lunch, Napper told Clark that he needed to find the copy, and she offered to find it for him. (Clark Dep. at 40:3-13.) Clark looked for, but did not find, the copy of the document, and Napper proceeded to his meeting without it (the "Lost Report Incident" or the "Incident"). (Clark Dep. at 40:14-24; Napper Dep. at 13:13-18.) Napper then reported the Incident to White, including his account of Clark's involvement. (Napper Decl. ¶¶ 5-6; White Decl. ¶ 5.)

Given the highly confidential nature of the missing document, White commenced an investigation to determine what happened. (White Decl. ¶¶ 5-7.) She first spoke with Clark about it on September 17, 2009, at which time Clark told her that she had no involvement in the Incident and "knew nothing about it." (Clark Dep. at 49:6-9.) Because Clark's account differed from Napper's, White again interviewed Napper to confirm his account. (White Dep. at 27:17-29:34.) In all, Napper relayed his account of the missing 360 Evaluation "several times in August and September," 2009. (Napper Decl. ¶ 6.)[3] Still concerned about the discrepancies between the two stories, White interviewed Clark for a second time. (Clark Dep. at 7:16-21; White Dep. 28:19-20.) In the second interview, all that Clark could recall was that Napper had, "in passing," indicated that he needed a document several times on the day of the incident. (Clark Dep. at 57:9-17.)

Between September 21, and October 1, 2009, MWV intended to retain Clark, but to place her on a "Performance Success Plan" (the "Performance Plan"). (Pl.'s Br. at Exs. 3, 4.) The Performance Plan indicates that Clark was, at least initially, meeting her "target[s]" and receiving

---

[3]Clark challenges White's credibility, in part citing her deposition testimony that she discussed the Incident with Napper only once. (White Dep. at 17:16-23; Pl.'s Br. at 3-4.) Such a detail is immaterial, and it does not otherwise appear to be a disputed point. See Anderson, 477 U.S. at 248; (Def.'s Reply at 5.) Nevertheless, the Court views the evidence in Clark's favor, concluding that White and Napper held several discussions on the topic.

3

"very good feedback from department managers." (Pl.'s Br. at Ex. 4.) It also indicates that "Terry [Clark] quickly assimilated into her role and immediately provided a dependable level of administrative support to Paula Rieck, Stephanie White, as well as other managers." (Id.) Such mostly positive comments are corroborated by Clark's annual 2008 and mid-year 2009 performance evaluations. (White Decl. at Exs. A, B.) The Performance Plan also indicated four areas of concern, including issues with scheduling, proactiveness, "follow-through," and most notably, confidentiality stemming from the Lost Report Incident. (Id.) Ultimately, it indicates an intent to monitor Clark's performance for the following 45-60 days, and does not signal any intent to terminate her. (Id.)

Early during the investigation, Napper asked that someone else provide him with administrative support during his future visits to the Richmond office. (Pl.'s Br. Opp'n ("Pl.'s Br.") at Ex. 2.) As Napper asserted, the Lost Report Incident, construed in any light, involved a highly sensitive document that "went missing, and the last person to have it in hand was Terry [Clark]." (Id.) He expressed further dissatisfaction with Clark, specifically citing her allegedly flippant demeanor and general lack of reliability. (Pl.'s Br. at Ex. 2; Clark Dep. at 86:3-5.) Ultimately, he requested that someone identified only as "Lilly" handle his administrative tasks from that point forward. (Pl.'s Br. at Ex. 2; Clark Dep. at 85:4-6.)

On September 30, 2010, Clark admitted to Hewlett that she had, in fact, shared the name of the employee evaluated in the 360 Evaluation, a senior vice president at MWV, with at least one other employee -- a known breach of confidentiality. (Pl.'s Br. at Ex. 3; Clark Dep. at 91:16-24.) That same day, White and Rieck had a conversation with Napper to again discuss the

4

missing 360 Evaluation. (Pl.'s Br. at 7-8, Ex. 5.)[4] Two weeks later, on October 14, 2009, MWV fired Ms. Clark. (Clark Dep. at 94.)

The record contains no evidence that Napper ever suggested that MWV terminate Clark. (See Rieck Dep. at 11:9-14.) Indeed, Rieck, the MWV employee who ultimately recommended Clark's termination, never asked Napper whether he thought that MWV should terminate Clark, and Napper did not learn about the termination until weeks after Clark was terminated. (Rieck Decl. ¶ 8; Napper Dep. at 40:25-41:9.)

## II. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. Id. at 255.

Once a motion for summary judgment is properly made and supported, the opposing party

---

[4]Although there is some dispute about whether the September 30 conversation between Napper and White included Rieck, the email attached to Plaintiff's opposition as Exhibit 5 permits a reasonable inference that, at the very least, Rieck was aware of the conversation between White and Napper. Thus, it does not matter whether Rieck was actually involved in the conversation, because the Court can reasonably infer that White and her learned the same information from Napper, if at all. That fact alone does not, however, give rise to an inference that Napper's September 30 comments constitute intentional, improper interference.

5

has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48 (emphasis in original). Indeed, summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact. Lewis v. City of Va. Beach Sheriff's Office, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). Of course, the Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

Furthermore, a "material fact" is a fact that might affect the outcome of a party's case. Anderson, 477 U.S. at 247-48; JKC Holding Co. LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable jury to return a verdict in that party's

favor. Anderson, 477 U.S. at 248.

### III. DISCUSSION

A federal court sitting in diversity, as here, must apply the choice of law rules for the state in which it sits - in this case, Virginia. See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938). If alleged liability is a matter of tort, Virginia applies the doctrine of *lex loci delicti*, meaning the law of the place of the wrong governs. Dreher v. Budget Rent-A-Car Sys., Inc., 272 Va. 390, 395, 634 S.E.2d 324, 327 (Va. 2006) (citations omitted). A claim for tortious interference is not a contract claim, but rather a tort claim. Accordingly, Virginia's tort choice of law rules apply. See PHP HealthCare Corp. V. EMSA Ltd. Partnership, 14 F.3d 941, 945 n.4 (4th Cir. 1993) (citation omitted).[5]

It is well-settled in Virginia that a plaintiff must prove four elements in order to establish a claim for tortious interference: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. DurrettBradshaw, P.C. v. MRC Consulting, L.C., 277 Va. 140, 145, 670 S.E.2d 704, 706 (Va. 2009) (citing Chaves v. Johnson, 230 Va. 112, 120, 335 S.E.2d 97, 102 (Va. 1985)). Where, as here, the contract at issue is an at-will employment contract, the plaintiff must also prove that the acts or methods used were "improper." Storey v. Patient First Corp., 207 F. Supp.

---

[5]If it were disputed and any party claimed that tortious interference claims sounded in contract, Virginia substantive law would still apply. Virginia's choice of law rule for claims sounding in contract is the place of formation. See Dreher, 634 S.E.2d at 327. Because the facts suggest that the contract was formed and performed solely in Virginia, Virginia law would still apply.

7

2d 431, 447 (E.D. Va. 2002) (citing Maximus v. Lockheed Info. Management Sys. Co., Inc., 254 Va. 408, 413-14, 493 S.E.2d 375 (Va. 1997)).

To show that "improper" methods were used, a plaintiff must show that the means are "illegal and independently tortious, such as violations of statutes, regulations, or recognized common-law rules." Duggin v. Adams, 234 Va. 221, 227, 360 S.E.2d 832, 836 (Va. 1987). Improper means may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship. Id.; see also, Storey, 207 F. Supp. 2d at 447 n.23.

Defendant Napper argues that summary judgment is warranted because the undisputed material facts are devoid of evidence that: (1) any alleged interference caused Clark's termination; (2) Napper had the requisite intent to interfere with her employment; and (3) Napper employed "improper" methods.

**A.      The Cause of Clark's Termination**

There is no doubt from the record that MWV did not immediately decide to terminate Clark, but that it was a process that evolved. At some point in mid to late September, MWV constructed the Performance Plan, allowing Clark to correct her performance issues during a 45 to 60 day period to follow. The Performance Plan, dated October 1, 2009, was never implemented or followed, as MWV chose to terminate Clark before implementation. The Performance Plan itself contains sufficient indicia that the majority of Clark's alleged shortcomings, including those arising from the Lost Report Incident, were already known to MWV at the time that it drafted the Performance Plan. The record shows that only two events

8

happened in the interim: (1) White, Rieck, and Napper had a conference call in which they discussed the Incident and Clark's role therein; and (2) Clark admitted to Hewlett that she had shared the confidential identity of the subject of the 360 Evaluation with at least one other employee.

There is at least some evidence that either of those two intervening events could have caused MWV to change course, resulting in the decision to terminate Clark's employment rather than proceed with the Performance Plan. A jury could infer that Napper's request to work with a different administrative assistant prompted Rieck, the MWV employee who ultimately decided to terminate Clark, to abandon the Performance Plan. Alternatively, the jury could conclude that Clark's admission that she had, indeed, divulged the confidential identity of the subject of the 360 Evaluation was the ultimate reason for her termination.

The resolution of those alternative theories, each supported by more than a mere scintilla of evidence, is the sort of disputed material fact within the province of a jury. See Anderson, 477 U.S. at 248. Of course, it is not appropriate, at the summary judgment stage, for the Court to impose its own resolution of such disputed facts, no matter which alternative may appear most likely. See Williams, 372 F.3d at 667. Thus, the argument cannot serve as a basis for awarding summary judgment.

**B.    Evidence of Intent**

Napper argues that the record contains no evidence that he intended to induce MWV to terminate Clark's employment. (Def.'s Br. at 14.) Although Clark may be entitled to a reasonable inference that Napper's input *influenced* MWV's decision, the present record contains no evidence that Napper *sought* her termination. (Rieck Dep. at 11:9-14; Rieck Decl. ¶ 8;

9

Napper Dep. at 40:25-41:9.) Indeed, the record indicates otherwise; that Napper never asked MWV to terminate Clark, and did not even learn about her termination until weeks after the fact. (Id.) As Napper asserts, "intent on the part of the interfering party is essential to a valid claim for tortious interference." (Def.'s Br. at 14 (citing Atl. Coast Vess Bevs., Inc. v. Farm Fresh, Inc., Case No. 3:93cv284, 1993 U.S. Dist. LEXIS 21405 at *18 (E.D. Va. Oct. 8, 1993).)

However, recent developments in Virginia law provide additional nuances to the element of intent in tortious interference cases, easing a putative plaintiff's burden to some extent. As the Supreme Court of Virginia recently explained:

> [The intent element is met] if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. The rule is broader, however, in its application than to cases in which the defendant has acted with this purpose or desire. It applies also to intentional interference . . . in which the actor does not act for the purpose of interfering with the contract or desire it but *knows that the interference is certain or substantially certain to occur as a result of his action*. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire *but known to him to be a necessary consequence of his action*.

DurretteBradshaw, 670 S.E.2d at 707 (adopting Restatement (Second) of Torts § 766 cmt. j (1979)) (emphasis added). The requirement that a putative plaintiff establish intent reflects the concept that interference with a contract, alone, is not actionable -- only *tortious* interference with a contract is actionable.

Here, there is absolutely no evidence that Napper had the specific purpose of causing MWV to terminate Clark's employment. However, under the rule explained in DurretteBradshaw, Clark could satisfy the intent requirement if she could establish that Napper knew that her termination would result from his account of her role in the Lost Report Incident. Nevertheless, the present record lacks such evidence. Indeed, Napper was not an employee of

10

MWV, and only occasionally required the services of their administrative assistants during his infrequent visits. (Napper Decl. ¶ 3.) Moreover, the record indicates that he did not even learn about Clark's termination until weeks after it occurred. It would not follow, then, that he would have the sort of authority or influence to coerce MWV to terminate an otherwise competent, performing employee. In fact, Rieck stated that the opposite was true -- Napper had no such authority over any MWV employees. (Rieck Decl. ¶8.)

Significantly, the undisputed record shows that MWV made the decision to terminate Clark -- not Napper. Because there is no evidence that Napper knew that his comments would lead to Clark's termination, and there is no other evidence of such a purpose on Napper's part, Clark cannot satisfy the intent requirement. Therefore, the Court recommends that Napper's motion for summary judgment can be granted on that basis alone.

**C.     "Improper" Methods**

Even if there was evidence of the requisite intent, the Court would still recommend the granting of summary judgment because there is no evidence that Napper's methods were "improper." See Duggin, 360 S.E.2d at 836.

The Supreme Court of Virginia has provided a thorough, but not exhaustive, list of the sort of conduct that would rise to the level of "improper" interference with an at-will employment contract. Id. at 836. Here, the undisputed record shows only that Napper expressed general dissatisfaction with Clark's work, specifically with regard to the Lost Report Incident. He also asked that someone else assist him in the future. (Pl.'s Br. at Ex. 2; Clark Dep. at 85:4-86:5.) His role in the Incident was primarily that of a witness, albeit a witness adverse to Clark. As Clark asserts, Napper gave his account of the Incident to MWV employees on more than one

11

occassion, and his account was not flattering to Clark. (Napper Decl. ¶ 6; Pl.'s Br. at 3.) Indeed, for purposes of summary judgment, the Court assumes that Napper asked that MWV assign a different executive assistant to provide him with support when visiting the Richmond offices. This alone, however, does not rise to the level of "improper" actions.

There is not a scintilla of evidence that Napper used any form of improper activity noted by the Supreme Court of Virginia as sufficient to sustain the element of necessary proof. Duggin, 360 S.E.2d at 836. From the undisputed record, he did not use undue influence, violence, deceit, duress, or a fiduciary relationship to influence MWV's decision. See Id. There is no evidence of any defamatory words spoken. Id. Indeed, Clark's brief in opposition fails to explain how Napper's influence was "improper" in any way. At worst, she alleges that Napper "exercised his influence to have MWV fire" her. (Pl.'s Br. at 13.) The fact that he used influence, if at all, does not necessarily suggest that it was "improper" influence, such as undue influence or a breach of fiduciary duty. Clark fails to articulate how the use of influence, if any, was legally improper, and the Court cannot find any evidence in the record to even infer as much.

Beyond the list of "improper" conduct specifically listed in Duggin, the record contains no other evidence that Napper's conduct was, in any way, improper. There is no dispute that the 360 Evaluation of a high-level MWV vice president was highly confidential. (Clark Dep. at 91:16-24.) Thus, it was prudent for MWV to investigate the disappearance of the document. It was only natural that Napper, in his role as the consultant assisting in the 360 Evaluation, would be a witness to the Incident. It is also undisputed that he shared his version of events, and that his version cast blame on Clark. That alone, without more, however, does not indicate that Napper abused his role as a witness, or otherwise used any improper method to affect the

outcome of the investigation.

Moreover, the record is otherwise devoid of any evidence that Napper undertook any affirmative action to cause Clark's termination. Rather, the undisputed testimony of MWV employees indicates that *they* approached Clark and requested his input during the investigation, and *MWV* ultimately made the decision to terminate Clark's employment. (See, e.g, Rieck Dep. at 11:9-14; Rieck Decl. ¶ 8.) Without any evidence that Clark took any affirmative step to cause Clark's termination, Clark cannot show that any alleged interference involved "improper" conduct. See Saliba v. Exxon Corp., 865 F. Supp. 306, 312 (W.D. Va. 1994) (holding that no improper conduct was actionable where defendant took no "affirmative acts which led to the termination" of the plaintiff).

Because the undisputed record contains no evidence that Napper's conduct was "improper," the Court recommends that Napper's motion for summary judgment be granted on that additional basis as well.

## IV. CONCLUSION

In conclusion, and for the reasons discussed herein, it is the recommendation of this Court that the Defendant's motion to strike (Docket No. 24) be DENIED and motion for summary judgment (Docket No. 18) be GRANTED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne, with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within**

**fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                                                     /s/
                                            Dennis W. Dohnal
                                            United States Magistrate Judge

Richmond, Virginia
Dated: November 3, 2010